# United States Court of Appeals

### For the Eighth Circuit

_____

No. 12-1069

_____

Swift Transportation Company of Arizona, LLC, formerly known as Swift
Transportation Co., Inc.; Lexington Insurance Company

*Plaintiffs - Appellants*

v.

Alfred F. Angulo, Jr.; Barrett and Deacon, P.A.

*Defendants - Appellees*

_____

Appeal from United States District Court
for the Eastern District of Arkansas - Little Rock

_____

Submitted: November 15, 2012
Filed: June 17, 2013

_____

Before RILEY, Chief Judge, WOLLMAN and MELLOY, Circuit Judges.

_____

RILEY, Chief Judge.

Filing this diversity action, 28 U.S.C. § 1332(a), Swift Transportation Company of Arizona, LLC (Swift) sued attorney Alfred F. Angulo, Jr. and the law firm Barrett and Deacon, P.A. (collectively, lawyers), alleging malpractice for failing to file a timely appeal of an adverse judgment in an Arkansas state court action. The

district court[1] granted summary judgment to the lawyers. We have appellate jurisdiction under 28 U.S.C. § 1291. Because the district court did not err in granting summary judgment, we affirm.

## I. BACKGROUND

### A. Factual Background[2]

In the early morning hours of November 8, 2004, Joe Turner was driving a bread delivery panel truck south on U.S. Highway 425 south of Star City, Arkansas, when a semi-tractor trailer forced Turner off of the road. Turner was thrown from his vehicle. Rebecca Barnett, a Pine Bluff, Arkansas paramedic, and her rescue team partner responded and transported Turner to Drew Memorial Hospital. As a result of the accident, Turner suffered a closed head injury, numerous fractures and lacerations, and tetraplegia. He is principally wheelchair dependent and has only limited use of his right arm.

On the morning of the accident, Angela Merritt Pryor was looking out her kitchen window when she heard, then observed "an eighteen wheeler going fast," in a line with at least six other vehicles "all going at a high rate of speed." Pryor reported hearing a "loud boom" just after seeing these vehicles, and she noted the time to be approximately 6:15 a.m. After approximately an hour and a half, Pryor went to the scene of the accident. Pryor told a state trooper she had seen a truck and heard a noise that morning, but did not know whether it was important to the accident

---

[1]The Honorable Susan Webber Wright, United States District Judge for the Eastern District of Arkansas.

[2]The parties rely on an abridged summary of the trial transcript styled as the "Abstract of Testimony and Proceedings." The record does not disclose how this abstract was prepared, and there is no attestation that the abstract is an accurate summary of the trial transcript. Because both parties rely on the abstract in their briefs and there has been no objection, we reluctantly will rely on this abstract for purposes of this opinion.

investigation. Pryor identified the truck as a Swift truck. Pryor subsequently clarified she had seen a stylized "S" on the side of the vehicle's trailer, but no markings on the tractor unit. Pryor was confident—"without a doubt"—it had been a Swift truck she observed before the accident.

At the scene of the accident and twice at the hospital, Turner reportedly stated a "Swift truck" forced him from the road, causing the accident. Kimberly Irons, a Star City resident who arrived on the scene shortly after the crash, remarked that Turner asked her to call Turner's wife because "a Swift truck ran him off the road." Turner also uttered he was twenty-one years old, although he was actually fifty-six, "and that he wanted to go deer hunting."

Barnett reported that, in the ambulance on the way to the hospital, Turner was disoriented and "babbling." Turner mentioned there had been another truck, but did not identify it as a Swift truck. At the hospital, approximately thirty or forty minutes after Barnett had taken Turner from the accident scene, Barnett overheard Turner ask a nurse about "[t]he Swift truck," and tell the nurse "[a] Swift truck run me off the road."

James Gosney, Turner's brother-in-law, visited Turner at the hospital. Gosney observed Turner was "conscious and in serious condition," and was "in pain," but he "did not appear to be unsure about what he was talking about." Turner told Gosney "I run off the road 'cause there was a Swift truck in my lane of traffic, and I was fixin' to hit it head on so I went off the road and that's when I hit it, the culvert." Turner also told Gosney "I'm going to miss my deer hunting." After speaking with Turner in the hospital, Gosney called Swift later in the week to report that a Swift truck had caused Turner's accident and that Turner had been badly injured.

As Turner began to recover from his injuries, Turner recalled that a semi-truck had been "on [his] side of the road." However, he did not recall seeing any markings

identifying the vehicle as a Swift truck, and he did not remember telling anyone after the accident that the truck had been a Swift truck.

Swift tractors are equipped with satellite tracking devices. Swift's onboard tracking system sends a location signal to the Swift computers on an hourly basis if there is no other communication between dispatch and the truck. Unless Swift takes steps to preserve the tracking data, this data is automatically deleted after seven days. After hearing about the accident from Gosney, Devon Daricek, a Swift security officer, ran a search tracking the location of Swift tractors at the time of the incident.

Swift did not preserve the electronic tracking information, so the only record of the search was a computer printout prepared by Daricek. The printout contained a table with five entries corresponding to five Swift vehicles. The "Proximity Reference" column listed "Little Rock, AR."[3] The date column, presumably recording the time the data was gathered, contained entries ranging from "04:23" to "05:11" on November 8, 2004. The following was printed below the table: "vehicles were found within 40 miles of the reference location." The printout did not identify the time zone, show whether the time was a.m. or p.m., or indicate the "reference location" used for the search. Below the printed information were several hand-written annotations, including "**40** mile Radius 11/08/04 0400 — 11/08-04 0600" and "615A central time or 515A Swift time."

B.    **Procedural History**
       1.    **State Court Action**
In 2005, Turner filed suit against Swift in the Circuit Court of Drew County, Arkansas (trial court). Swift retained Angulo, who later became an employee of Barrett and Deacon, to defend the company. The first trial of the case was in 2007 and resulted in a hung jury. The case was retried in May 2008.

---

[3]Star City is approximately seventy miles southeast of Little Rock.

During discovery, Swift initially failed to disclose the satellite tracking printout, telling Turner the data had not been preserved. In October 2005, Swift disclosed the printout.

Dennis Ritchie, a Swift safety advisor, testified Swift sometimes used a twenty-mile radius search parameter when conducting satellite vehicle tracking. Ritchie did not conduct the search at issue here, but testified he believed a forty-mile radius was used, even though this broader search radius might deviate from standard practices. Ritchie testified it was possible for a Swift truck to pass through the target area undetected if a twenty-mile radius were used, but a forty-mile radius would be more likely to detect any Swift vehicles in the area.

Swift initially identified Lloyd Telking, Daricek's supervisor, as the employee who conducted the computer search. At trial, Daricek testified that he, not Telking, actually conducted search. Daricek claimed he used a forty-mile radius with Star City at the center. He testified it was not possible to add or remove vehicles from the search, so any vehicles in the area at the time of the accident would have shown up on the printout. Daricek testified the printout revealed no Swift tractors that were driving north on Highway 425 at the time of the accident. He also testified other trucking companies would use Swift trailers, and Swift had no way of tracking trailers that were not used by Swift drivers driving Swift tractors.

Swift also informed Turner that an "unknown person" had contacted Swift after Turner's accident. On August 30, 2005, Turner advised Swift that Gosney made that call. Swift later admitted Swift's records revealed the call had come from Gosney. Ritchie stated it was Swift's standard procedure to identify all informants as "unknown," even when Swift was aware of the informant's identity.

Pryor testified she saw a Swift trailer just before hearing the accident. Barnett, Irons, and Gosney each testified, over Swift's hearsay objection, to what Turner said

at various times after the accident about a Swift truck.  On cross-examination, Turner responded as follows:

> Q: And you couldn[']t make out any markings on that truck, correct?
>
> A: I do not remember any markings.
>
> Q: You didn't say [previously under oath] you didn't remember; you said you couldn't make them out.
>
> A: Couldn't make them out, same thing.
>
> . . . .
>
> Q: Can you identify that truck that you saw out there that morning as a Swift truck?
>
> A: I cannot tell you that was a Swift truck.  I was only looking at the headlights and that truck was coming straight at me.

Turner also testified he had "seen trucks that looked like" an image of a white tractor-trailer with a stylized logo of the word "Swift" prominently displayed above the windshield.  Another image, this one provided by Swift and entered into evidence without objection, provided a close-up image of a "Swift" logo printed on the aerodynamic "air foil" above the windshield of the tractor, similar to the image identified by Turner.

Dr. Gary Souheaver, a clinical neuropsychologist and brain injury expert, testified for Turner.  Dr. Souheaver explained that as a result of traumatic brain injury, a person might forget specific details of events before that person would forget the event itself.  When asked to evaluate the statements of Barnett, Irons, and Gosney about Turner's post-accident identification of the truck, Dr. Souheaver opined "based on the fact that there were three separate occasions, three separate individuals, and

three separate times, the statements I would judge to be very reliable." Dr. Souheaver clarified that he was not suggesting the jury should believe Barnett, Irons, and Gosney.

Turner presented a demonstrative exhibit, an animation purporting to recreate the accident from Turner's perspective inside the bread truck. According to the appendix summary, the animation depicted a passenger vehicle's headlights heading toward the bread truck from the opposite lane of traffic. In the animation, the semi-tractor trailer enters the picture, attempting to pass the passenger vehicle. The animated tractor-trailer drives straight toward the bread truck. The tractor is painted white, with a visible "Swift" logo above the air foil. The animated truck forces the bread truck off the road. The court admitted the video into evidence, over Swift's objection.

The trial court also instructed the jury on spoliation, declaring:

> If you find that Swift intentionally destroyed, lost, or suppressed satellite data with knowledge that the data may be material to a potential claim or defense, you may draw the inference that the evidence would have been favorable to . . . Turner's claim or unfavorable to Swift's defense.

The jury returned a verdict in Turner's favor in the amount of $6,000,000. Swift appealed to the Arkansas Court of Appeals, but the court dismissed the appeal without prejudice because a pending subrogation claim rendered the trial court's order not final.

Due to an alleged oversight, the lawyers failed to file a subsequent appeal at the proper time. Swift moved the Arkansas trial court to extend the time to file the appeal, and filed an appeal out of time. Swift ultimately paid the judgment in full and the appellate court dismissed the pending Arkansas appeal, without the appeals court deciding whether to allow Swift to file the out of time appeal.

Swift sued the lawyers for malpractice, invoking the district court's diversity jurisdiction and alleging the failure to file a timely appeal denied Swift the opportunity to prevail in the state court action. The lawyers moved for summary judgment, which the district court granted because the district court concluded Swift would not have been successful on any of its issues in the state appeal. This appeal follows.

## II.   DISCUSSION
### A.   Standard of Review and Applicable Law

We review the district court's grant of summary judgment de novo, construing all facts and taking all reasonable inferences in favor of the non-moving party. BancorpSouth Bank v. Hazelwood Logistics Center, 706 F.3d 888, 893 (8th Cir. 2013). We must affirm summary judgment if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

In this diversity of citizenship case, we apply the substantive law of Arkansas. See HealthEast Bethesda Hosp. v. United Commercial Travelers of Am., 596 F.3d 986, 987 (8th Cir. 2010). In Arkansas, a malpractice "plaintiff must prove that the attorney's conduct fell below the generally accepted standard of practice and that this conduct proximately caused the plaintiff damages." S. Farm Bureau Cas. Ins. Co. v. Daggett, 118 S.W.3d 525, 530 (Ark. 2003). In this case, the lawyers do not assert that the alleged conduct of failing to file a timely appeal met the acceptable standard of attorney representation. The only issue raised is whether this error proximately caused harm to Swift. See id. (explaining, "[t]o show damages and proximate cause" deriving from the lawyers' failure to perfect an appeal, Swift must show "the result in the underlying action would have been different," but for the lawyers' negligence).

**B.    Sufficiency of the Evidence**

Swift argues the trial court erred in failing to grant a directed verdict because no witness at trial testified the tractor portion of the cab displayed a "Swift" logo or otherwise demonstrated the driver of the truck was employed by Swift.  Swift's theory is Swift cannot be liable under Arkansas law unless Turner proved there was a Swift logo on the tractor indicating the truck was owned by Swift and operated by a Swift driver.[4]  Arkansas appellate courts review the denial of a motion for a directed verdict for "substantial evidence," meaning evidence "which goes beyond suspicion or conjecture and is sufficient to compel a conclusion one way or the other."  Ethyl Corp. v. Johnson, 49 S.W.3d 644, 647 (Ark. 2001).  In conducting this inquiry, the Arkansas courts "view the evidence and all reasonable inferences arising therefrom in the light most favorable to the party on whose behalf judgment was entered."  Id.

There was sufficient evidence to support the verdict.  Three witnesses testified Turner, shortly after the accident, identified a Swift truck as causing the accident.  Turner himself recalled he saw an eighteen wheeler "coming straight at" him, and before the accident, Turner had become familiar with the appearance of Swift trucks and with the Swift logo.  The jury could infer that, if Turner reported he saw a Swift truck at the time of the accident, he must have seen the Swift logo on the air foil above the cab.  While this is not the only inference the jury reasonably could have drawn from the evidence, it is *a* reasonable inference, which is sufficient to support a jury verdict under Arkansas law.  See id.

Evidence that there was a Swift truck in the vicinity at the time of the accident supports this inference.  Pryor first testified she witnessed a Swift truck just before

---

[4]While Arkansas does not appear to have a case directly on point, we accept, without deciding, Swift's premise for this appeal.  See, e.g., Piggly Wiggly S., Inc. v. Hercules, Inc., 259 S.E.2d 219, 221 (Ga. Ct. App. 1979) (deciding the owner of a cargo trailer was not responsible for the negligent actions of an independent contractor hauling the trailer on behalf of a third party).

the accident. On cross-examination, Pryor could not say the tractor had Swift markings. A reasonable jury could conclude Pryor's sighting of a "Swift truck" made it more likely Turner actually saw a Swift tractor at the time of the accident. The same can be said of the inference arising from Swift's failure to preserve evidence from its satellite tracking system. Following the spoliation instruction, the jury was permitted to conclude there was a Swift vehicle in the area at the time of the accident, further supporting the supposition Turner actually saw a Swift truck.

Because there was sufficient evidence to support the jury's verdict, the Arkansas appellate courts would not have reversed the judgment against Swift on insufficient evidence grounds.

### C.    Evidentiary Issues
#### 1.    Discovery Disputes

Swift argues the Arkansas Court of Appeals would have reversed because the trial court abused its discretion in allowing Turner to introduce evidence Swift (1) allegedly concealed the fact that Gosney called Swift within days of the accident to inform Swift of the event, and (2) failed to preserve and to disclose the satellite tracking data. Swift contends this information was irrelevant and Turner suffered no prejudice as a result of Swift's alleged omission. The Arkansas appellate courts review evidentiary rulings for abuse of discretion. See Arthur v. Zearley, 992 S.W.2d 67, 74 (Ark. 1999) ("A trial court is accorded wide discretion in evidentiary rulings, and will not be reversed on such rulings absent a manifest abuse of discretion."); see also Ark. R. Evid. 611(a).[5]

---

[5]We also commend our Eighth Circuit trial courts for supervising and sanctioning, when appropriate, disclosure and discovery abuses. See Carmody v. Kan. City Bd. of Police Comm'rs, 713 F.3d 401, 404-06 (8th Cir. 2013).

The evidence Swift withheld Gosney's name is relevant to assessing the reliability of Swift's satellite tracking data. Swift initially claimed an unknown person had informed Swift of the accident, and Swift initially denied having any record of the satellite data. It was only after Turner alerted Swift that Turner knew it was Gosney who had made the call that Swift confirmed this information and released the printed copy of the partial tracking data. A Swift employee even admitted it was Swift's policy to deny knowing the identity of informants such as Gosney, a policy that calls into question Swift's veracity in conducting the tracking search and failing to retain the electronic data. In Arkansas, "matters affecting the credibility of a witness are always relevant." Jones v. State, 78 S.W.3d 104, 110 (Ark. 2002).[6]

The trial court also did not abuse its discretion by giving a spoliation instruction to the jury. See Dupont v. Fred's Stores of Tenn., Inc., 652 F.3d 878, 882 (8th Cir. 2011) ("We review a district court's jury instructions for an abuse of discretion."). "A party is entitled to a jury instruction when it is a correct statement of the law and there is some basis in the evidence to support the giving of the instruction." Tomlin v. Wal-Mart Stores, Inc., 100 S.W.3d 57, 64 (Ark. Ct. App. 2003). Spoliation occurs when a party intentionally destroys evidence. See id. at 62. Swift proposes the trial court erred in giving the spoliation instruction, reasoning (1) Swift did not act in bad faith because the evidence was automatically destroyed in the ordinary course of business, and (2) Turner suffered no prejudice because Swift disclosed the printout of the satellite search, providing Turner with the information he requested. We reject these arguments.

Contrary to Swift's assertions, the trial court unquestionably found Swift acted in bad faith by failing to preserve the digital evidence. In deciding to give the

---

[6]The evidence apparently was admitted to prove Swift's lack of credibility, not as a discovery sanction.

spoliation instruction, the trial court found "Swift has been intentionally deceptive," mentioning "the things that Swift has done that have been intentionally wrong in [d]iscovery," and commenting Swift "just flat out lied." The trial court noted it was "not required to believe anything [Swift's witnesses] sa[id]," and remarked that Swift "control[led] the satellite data, and some of it . . . [the trial court] believe[d] could have been preserved if, in fact, it had been exonerat[ing]." The trial court concluded by saying, "my reason is simply this, I don't trust the document." Although the trial court did not use the words "bad faith," it is abundantly clear the trial court believed it was likely Swift intentionally allowed the electronic satellite tracking data to be destroyed.

Swift's proposition that Turner suffered no prejudice because Turner was given access to the printed record well in advance of trial is also without merit. Having access to the original electronic data would have allowed Turner to verify Swift's search was thorough and accurate. Among other concerns, it was not possible to determine from the printed materials whether Daricek used Star City as the focal point of the search, as Daricek testified. The only location printed on the document was Little Rock. Nor was it clear from the testimony that the search used a forty-mile radius, as Daricek claimed, rather than a twenty-mile radius, as Ritchie testified. Lastly, original electronic data would have enabled Turner to verify Swift did not simply fabricate the document. The trial court did not err in concluding Turner was prejudiced by Swift's failure to preserve the electronic tracking data.

The trial court did not abuse its discretion in admitting evidence of the discovery disputes or in instructing the jury on spoliation. The Arkansas appellate courts would not have disturbed the verdict on these grounds, and Swift is not entitled to any relief based upon this claim.

## 2.     Hearsay

Swift contends the trial court abused its discretion in admitting hearsay statements of Irons, Barnett, and Gosney.  We disagree.

Each of these witnesses testified to hearing Turner say a Swift truck ran him off the road.  The trial court admitted the evidence as either an excited utterance or as a present sense impression.  Because all three statements likely were admissible as excited utterances, the trial court did not abuse its discretion.  See Ark. R. Evid. 803(2) ("A statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition" is "not excluded by the hearsay rule."); Fudge v. State, 20 S.W.3d 315, 320 (Ark. 2000) (noting a trial court's admission of testimony under the excited utterance rule is reviewed for abuse of discretion).  For a statement to qualify under the excited utterance rule, "'there must be an event which excites the declarant[,] . . . the statement[] must be uttered during the period of excitement[,] and must express the declarant's reaction to the event.'" Id. (quoting Moore v. State, 882 S.W.2d 667, 668 (Ark. 1994)).  Factors such as the passage of time and the declarant's "physical and mental condition" at the time of the utterance are relevant, but no one factor necessarily is dispositive.  See id.

Turner made the statement to Irons approximately fifteen minutes after the accident while Turner was lying in a ditch and before the paramedics arrived.  Irons testified Turner was confused or disoriented, telling Irons that Turner was twenty-one years old and wanted to go deer hunting, when in fact he was fifty-six and had been working just before the accident.  The trial court did not abuse its discretion in finding Turner was still influenced by the stress of the event when he made the purported statement to Irons.  See id.[7]

_____

[7]We add the trial court did not abuse its discretion in finding this statement was also admissible under the present sense impression exception to the hearsay rule.  See

-13-

The trial court also did not abuse its discretion in admitting the statement Turner made at the hospital after the accident. Swift asserts this statement could not have been an excited utterance because it occurred "over one hour after" the accident, and after Turner had been given oxygen and transported to the hospital. The trial court disagreed given the circumstances. Barnett testified Turner remained disoriented at the scene of the accident and in the ambulance, and he had suffered a head injury. The trial court did not abuse its discretion under Arkansas law in weighing the factors and concluding the statement was made while Turner was still influenced by the excitement of the event. See id. (noting a "lapse of time" from "one to several hours" was "not determinitive").

The statements Turner made to Gosney present the closest question, but admission of these statements was still within the trial court's discretion. Gosney testified that when he saw Turner, Turner was "conscious and in serious condition" and was "in pain." Gosney also said Turner remarked, "I'm going to miss my deer hunting." Swift contends this proves Turner was in a calm and rational state because Turner "did not appear unsure about his statements and was talking about deer hunting over the weekend." The district court may have concluded the deer hunting comment was in fact a sign of Turner's continuing excitement and disorientation. Turner made a similar comment to Irons shortly after the crash. The similar remarks reported by Irons and Barnett about a Swift truck, together with Pryor's observation, tend to corroborate Gosney's recollections and do support the trial court's decision to admit these later statements. Swift challenges the statement because it was made hours after the accident, however, again, the passage of "several hours . . . is not determinative." Id. at 320-21. There was no abuse of discretion, and the Arkansas

Ark. R. Evid. 803(1) (excluding from the definition of hearsay "[a] statement describing or explaining an event or condition made while the declarant was perceiving the event or condition, *or immediately thereafter*") (emphasis added).

-14-

appellate courts more than likely would not have disturbed the jury's verdict on these grounds.

### 3. Expert Testimony

Swift also challenges the testimony of Dr. Souheaver, arguing this testimony served no purpose other than to bolster the credibility of the three hearsay witnesses. See Hinkston v. State, 10 S.W.3d 906, 910 (Ark. 2000) ("Expert testimony on the credibility of witnesses is an invasion of the jury's province."). Swift's argument fails.

Dr. Souheaver made some comments during direct examination which, taken in isolation, probably were outside the scope of legitimate expert testimony because they invaded the province of the jury. Dr. Souheaver remarked, "I think based on the fact that there were three separate occasions [where Turner purportedly identified a Swift truck,] three separate individuals, and three separate times, the statements I would judge to be very reliable." On cross-examination, Dr. Souheaver clarified he had no special expertise in evaluating the credibility of the hearsay witnesses and expressed no opinion as to their reliability. He explained that, if the three witnesses were reliable and Turner had identified a Swift truck on multiple occasions, then his expert opinion was that Turner could have known it was a Swift truck at the time, but subsequently forgotten this information because of his brain injury. Dr. Souheaver specifically made clear "I am not testifying that the jury should believe what Ms. Irons, Ms. Barnett and Mr. Gosney claim Mr. Turner said," and clarified he could not offer any opinion as to whether these witnesses were reliable or had accurately and honestly recalled what Turner purportedly said.

Any prejudice Swift may have suffered from Dr. Souheaver's improper comments was lessened by Dr. Souheaver's subsequent clarification of his opinion. We doubt the Arkansas appellate courts would have granted relief based upon this particular claim. See, e.g., Jackson v. State, 197 S.W.3d 468, 474-75 (Ark. 2004)

-15-

(recognizing Arkansas courts do not reverse due to the erroneous admission of expert testimony where the error "was rendered harmless . . . by the admission of subsequent testimony").

### 4. Animated Recreation

Swift also asserts the trial court abused its discretion in permitting Turner to present the demonstrative animation purporting to recreate the accident. In Arkansas, a demonstrative video depiction is admissible if it is "'substantially similar'" to the accident and any variation in the conditions are "'not . . . likely to confuse and mislead the jury.'" Carter v. Mo. Pac. R.R., 681 S.W.2d 314, 315-16 (Ark. 1984) (quoting Carr v. Suzuki Motor Co., 655 S.W.2d 364, 365 (Ark. 1983)); see also McMickle v. Griffin, 254 S.W.3d 729, 745 (Ark. 2007). Arkansas appellate courts review the trial court's admission of demonstrative evidence for abuse of discretion. Id. at 743.

Swift argues the trial court erred in admitting the evidence because Turner failed to lay a proper foundation for the proposition that the truck had a "Swift" logo on the air foil. We reject this argument. The trial court recognized the jury could have decided "the only way that [Turner] could have identified [the truck as a Swift tractor during the accident] is by seeing 'Swift' on the [air foil]." This inference comports with the evidence. Turner testified the truck came straight at him and ran him off the road. Based on this testimony, a reasonable jury could conclude Turner had no opportunity to view the side of the trailer, and if Turner saw a Swift logo it must have been on the front of the vehicle. Other evidence showed Swift trucks have a Swift logo on the air foil.

Swift maintains the trial court's admission of this exhibit indicated the trial court "adopt[ed] *ipso facto* [Turner]'s 'theory' that if Turner made statements about a 'Swift truck,' then it must have been because he saw markings on the front of the truck." Swift's suggestion misses the mark. By admitting Turner's evidence, the trial

court did not make any judgment as to the credibility of Turner's case. The trial court ultimately recognized Turner produced sufficient evidence for a reasonable jury to consider and possibly accept Turner's position. The trial court did not abuse its discretion in this regard, and the Arkansas appellate courts would not have reversed.

## III.    CONCLUSION

We affirm.

_____